GLENN B. McCORMICK
Acting United States Attorney
District of Arizona
JONATHAN B. GRANOFF
LORI L. PRICE
State Bar No. 025698
Assistant U.S. Attorneys
United States Courthouse
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701
Telephone: 520-620-7300
Email: jonathan.granoff@usdoj.gov
Attorneys for Plaintiff

FILED

2021 OCT 20   PM 5: 15

CLERK US DISTRICT COURT
DISTRICT OF ARIZONA

**CR21-02716 TUC-JCH(LCK)**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

United States of America,

Plaintiff,

vs.

Linh Cao Nguyen,

Defendant.

I N D I C T M E N T

Violations:
18 U.S.C. § 1347 (Health Care Fraud)
(Count 1)

18 U.S.C. § 1035 (False Statement
Relating to A Health Care Matter)
(Counts 2-28)

18 U.S.C. § 1035 (False Statement
Relating to A Health Care Matter)
(Counts 29-44)

18 U.S.C. § 1028A (Aggravated Identity
Theft)
(Counts 45-50)

18 U.S.C. § 982(a)(7)
(Forfeiture Allegation)

VICTIM CASE

**THE GRAND JURY CHARGES:**

**INTRODUCTORY ALLEGATIONS**

At all times relevant to this Indictment, within the District of Arizona and elsewhere:

***The Defendant and His Companies***

1.  The defendant LINH CAO NGUYEN (NGUYEN) was a physician who owned, operated, and oversaw a mobile multi-specialty medical practice that primarily treated

1   patients in their homes and living facilities across the greater Phoenix and Tucson
2   metropolitan areas.

3   2. The majority of NGUYEN'S practice was through the mobile unit. His practice hired
4   health care providers. These health care providers traveled to different homes and living
5   facilities across the greater Phoenix and Tucson metropolitan areas to provide services
6   to patients where they lived. NGUYEN'S office staff coordinated the health care
7   providers' schedules and sent those schedules to the health care providers in the field,
8   communicating with them electronically and telephonically. Care was managed
9   through an electronic health records system in which health care providers documented
10  services provided while in the field and office staff then processed the health records
11  for follow-up care and billing.

12  3. During periods of time within the scope of the indictment, office staff for NGUYEN'S
13  practice worked from an office location in the greater Phoenix area and a location in
14  Vietnam.

15  4. In NGUYEN'S practice, health care providers typically conducted most of their work
16  in the field. They typically traveled to the office infrequently – sometimes on a monthly
17  basis for the practice's staff meetings.

18  5. NGUYEN operated his practice under multiple corporate names. The four primary
19  companies used to bill health insurance programs, identified by their tax identification
20  numbers (TINs), were:

21      a. Global MD Network, LLC, dba MD 24 House Call Physicians Network, and
22          later identified as MD 24, Inc., TIN xx-xxx4675;

23      b. MD 24 Arizona, Inc., originally identified as MD24 House Call, Inc., and now
24          known as Arizona Doctors, LLC in the Arizona Corporation Commission
25          records, TIN xx-xxx4667;

26      c. EcoHealth Neuropathy, TIN xx-xxx8753; and

27      d. MD 24 CA, Inc. dba SIP DC CA, TIN xx-xxx4317.

28

6. All the companies, except MD 24 CA, Inc., were incorporated in the State of Arizona. MD 24 CA, Inc. was incorporated in the State of California. Through his companies, NGUYEN'S practice was an enrolled Medicare provider since approximately June 2009.

7. Through his companies, NGUYEN's practice billed Medicare, in the timeframe of the indictment, approximately $50 million dollars and was paid approximately $33 million dollars by Medicare in the same timeframe.

***The Government Insurance Programs - Medicare***

8. The Medicare Program (Medicare) was a federally funded program, affecting commerce, that provided health care benefits to individuals who were 65 years and older and certain disabled individuals, commonly referred to as "beneficiaries." Medicare was administered by the Centers for Medicare and Medicaid Services (CMS), a federal agency under the United States Department of Health and Human Services. Medicare paid claims by participating health care providers for medical services rendered to Medicare beneficiaries. Medicare was a "health care benefit program", as defined by 18 U.S.C. § 24(b).

9. Medicare was divided into parts. Medicare Part B covered some or all of the cost of medical services such as preventive services, outpatient care, and lab tests provided by physicians and qualified non-physician practitioners (NPPs), including physician assistants and nurse practitioners. Physicians and NPPs were collectively known as "health care providers".

10. Under certain circumstances, Medicare Part B covered the cost of home or living facility visits for evaluation and management services provided to a beneficiary by a physician or qualified NPP. To reimburse for home or living facility visits, Medicare required that the medical record document the medical necessity of making a home or living facility visit in lieu of an office or outpatient visit. Prior to approximately March 1, 2020, Medicare required the health care provider's physical presence in the

1    beneficiary's home or living facility to bill for a health care service rendered at the
2    home or living facility.

3    11. The Medicare Part B program was administered by private contractors, known as
4    "carriers". These carriers processed the Medicare (CMS) enrollment forms and
5    insurance claims submitted by health care providers. The carrier for the region that
6    included the State of Arizona was Noridian Administrative Services.

7    12. To be paid for health care services rendered under the Medicare Part B program, a
8    health care provider was first required to enroll in the program. To enroll, a health care
9    provider and the provider's respective medical practice were required to:

10        a.  Have a unique 10-digit number known as the National Provider Identifier (NPI);
11            and
12        b.  Complete a Medicare (CMS) Enrollment Application. Physicians and other
13            health care providers enrolling as individuals were required to complete an
14            application form called the CMS-855I and organizations such as clinics and
15            other group practices were required to complete an application form called the
16            CMS-855B.

17    13. As part of the conditions of enrollment, the applicant was required to certify, after
18    notification of the criminal penalties for knowingly providing false information, that
19    the applicant would provide truthful information and follow the rules and regulations
20    required of the Medicare (CMS) program. The applicant also agreed to not knowingly
21    present or cause to be presented a false or fraudulent claim for payment by Medicare.

22    14. "Incident To" Services.

23        a.  Services provided by non-physicians that were furnished "incident to" a
24            physician's professional services could be billed under the physician's NPI, if
25            specific requirements were satisfied. To qualify for "incident to" billing under
26            the physician's NPI, the following requirements must have been met:
27            i.  The services were rendered under the direct supervision of the physician,

28

    ii. The services were furnished as an integral, although incidental, part of the physician's professional services in the course of the diagnosis or treatment of an injury or illness, and

    iii. Billing "incident to" the physician, the physician must have initiated the treatment and seen the patient at a frequency that reflected the physician's active involvement in the patient's case. This included both new and established patients being seen for new problems.

b. When the services of a non-physician satisfied all the "incident to" requirements, those services billed under the physician's NPI were reimbursed at 100% of the Medicare Physician Fee Schedule.

c. When the services of a NPP, such as a nurse practitioner or physician assistant, did not meet the requirements of "incident to" billing, those services were billed under the NPI of the NPP and were reimbursed at 85% of the Medicare Physician Fee Schedule.

d. Like physicians, services "incident to" a NPP's professional services could be billed under the NPP's NPI, if the specific "incident to" requirements identified above were satisfied. When the "incident to" services were supervised by a NPP, rather than a physician, those services were reimbursed at 85% of the Medicare Physician Fee Schedule.

e. To bill "incident to" services, the services must have been rendered under the direct supervision of the provider whose NPI was being used to bill for the service. The provider directly supervising the service must have been immediately available, meaning if the service was provided in a patient's residence, the supervising provider must have been physically present in the residence to provide assistance and direction throughout the time the service was performed.

    i. If the provider under whose NPI the service was billed was not present and the service was performed by an NPP, the service had to be billed

under the NPI of the NPP who performed the service. In that instance, the service would be reimbursed at 85% of the Medicare Physician Fee Schedule.

    ii.  If the provider under whose NPI the service was billed was not present and the service was performed by auxiliary personnel, such as a nurse or medical assistant, the service was not reimbursable.

15. Co-payments. The Medicare Part B program required that beneficiaries bear some of the costs of their care. In general, Medicare covers 80 percent of the reasonable charges for services. Medicare beneficiaries or any supplemental insurance carriers were responsible for the remaining 20 percent. This remaining 20 percent was typically referred to as the beneficiaries' "copayment" amount.

    a.  The copayment amount was billed by the provider to the beneficiary.

    b.  Medicare prohibited the waiver of copayments by providers, practitioners, or suppliers because it resulted in: (a) false claims; and (b) excessive utilization of items and services paid for by Medicare.

***The Government Insurance Programs – Tricare***

16. Tricare was a government health insurance program of the United States Department of Defense (DoD) Military Health System, affecting commerce, that provided coverage for DoD beneficiaries worldwide, including active duty service members, National Guard and Reserve members, retirees, and their families and survivors. Individuals who received health care benefits through Tricare were referred to as "Tricare beneficiaries." The Defense Health Agency (DHA), an agency of DoD, was the entity responsible for overseeing and administering the Tricare program. Tricare was a "health care benefit program", as defined by 18 U.S.C. § 24(b).

17. Tricare was administered by managed support contractors. Health care providers submitted claims for services rendered to Tricare members to the managed support contractors, either electronically or on paper, and were required to be truthful in their submissions.

18. The reimbursement for services provided by NPPs, such as nurse practitioners, physician assistants, could not exceed 85% of the allowable charge for a comparable service rendered by a physician.

***The Government Insurance Programs - AHCCCS***

19. The Arizona Health Care Cost Containment System (AHCCCS) was the Arizona State Medicaid Authority and the entity tasked with administering the State's Medicaid program. AHCCCS was a state and federally funded program, affecting commerce, that covered medically needed preventative, acute and behavioral health care when it was provided by an AHCCCS registered provider. AHCCCS also offered limited coverage of rehabilitative services, home health care and long-term care services. These services were provided to Arizona residents who met income and eligibility requirements. AHCCCS was a "health care benefit program", as defined by 18 U.S.C. § 24(b).

20. AHCCCS assigned its members an individual identification number (AHCCCS ID Number) to uniquely identify the AHCCCS member. Members in acute care programs were enrolled with an AHCCCS health plan that coordinated the member's services.

21. AHCCCS also assigned an individual identification number (Provider ID) to uniquely identify service providers that registered with AHCCCS. The Provider ID was also used to identify which providers rendered a service to AHCCCS members and which providers received payment for service rendered to AHCCCS members. While each provider who saw an AHCCCS member must have had a Provider ID, not all providers were required to have a Group Biller ID. The Group Biller ID identified the organization acting as the financial representative of any provider or group of providers who had authorized the organization to act on the provider(s)' behalf.

22. Prior to October 1, 2016, AHCCCS did not cover foot and ankle services for adults (age 21 and older) when rendered by a podiatrist or podiatric surgeon.

23. During the scope of the indictment, AHCCCS covered routine foot care only when medically necessary when the member had a systemic disease of sufficient severity that performance of foot care procedures by a nonprofessional person would be hazardous.

Routine foot care included the cutting or removal of corns or calluses, the trimming of nails (including mycotic nails), and other hygienic and preventive maintenance care in the realm of self-care.

**Submitting Claims to Government Health Insurance Programs**

24. Together, Medicare, AHCCCS, and Tricare are referenced as "government health insurance programs".

25. To receive payment from one of the government health insurance programs, a medical provider was required to submit a claim, either electronically or in writing, to the government health insurance program.

26. As part of the claim, the health care provider was required to supply, among other information, the beneficiary's identifying information, the rendering provider's identifying information (including the NPI of the provider), the tax identification number of the associated medical practice, the date of service, the diagnosis, a description of the service(s) provided and the corresponding Current Procedural Terminology (CPT) code(s).

27. Typically, when a health care provider worked for a medical practice, the medical practice was responsible for submitting the claims to the government health insurance programs and receiving reimbursement. The medical practice would then pay the health care providers.

28. A medical practice would submit claims to government health insurance programs directly or through third-party billing companies it employed to process claims on its behalf. A medical practice that used third-party billing companies generally submitted all of the information necessary to process the claims to the billing company, including the CPT codes, via a document commonly referred to as a charge slip or superbill or through billing software.

29. Claims would be submitted to the government health insurance programs either electronically on a form commonly referred to as Form 837 or on paper on a form commonly referred to as Form 1500.

30. As part of the claim submission process, health care providers agreed the services provided were medically necessary and were rendered by the provider identified as the rendering provider.

31. To participate in government health insurance programs, participating providers agreed that all claims submitted under their provider numbers would be accurate, compete, and truthful.

***The Commercial Insurance Programs***

32. Blue Cross Blue Shield and UnitedHealthcare were non-government run health insurance programs, affecting commerce, under which medical benefits, items and services were provided to individuals commonly referred to as "members". BCBS and UnitedHealthcare were each a "health care benefit program" as defined by 18 U.S.C. § 24(b).

33. To receive reimbursement or payment from BCBS or UnitedHealthcare, health care providers submitted claims similar to submitting claims to government health insurance programs. Health care providers were required to supply, among other information, the beneficiary's identifying information, the rendering provider's identifying information (including the NPI of the provider), the tax identification number of the associated medical practice, the date of service, the diagnosis, a description of the service(s) provided and the corresponding Current Procedural Terminology (CPT) code(s).

34. Unlike Medicare, providers did not have to be enrolled as a "participating provider" with a commercial insurance program for reimbursement for services. When a provider did not have an agreement or contract with a commercial insurance program, the provider was known as an "out-of-network" or "non-participating" provider. The biggest difference between a participating provider and a non-participating provider was the payment rate each received for services. A participating provider's contract bound the provider to accept the rate in the contract, while a non-participating provider was reimbursed pursuant to the member's plan.

35. Regardless of whether a provider was participating or non-participating, the provider agreed in billing the commercial insurance program that the provider would be truthful when submitting claims.

***Health Care Billing Through CPT Coding***

36. The American Medical Association created the CPT coding system to standardize the way health care providers reported medical services. To bill health insurance programs, health care providers used a five-digit number, commonly known as a CPT code, that identified the nature and complexity of the service provided. The CPT codes were listed in the Current Procedural Terminology (CPT) manual, which was published annually by the American Medical Association. CPT codes were universally used by health care providers to bill government and commercial health insurance programs for services rendered. Virtually every medical procedure had its own CPT code and insurance programs paid a specified amount of money for each CPT code billed.

37. As part of common billing practices, health care providers and/or the practice for which they worked identified the CPT codes on the charge slips or super bills that described the services provided. The CPT codes were then inputted into claim forms that were submitted electronically or in hard copy to the health care insurance programs for reimbursement of services performed.

38. Evaluation and Management (E/M) codes within the CPT coding system encompassed the health care services provided by health care providers during patient visits. Typically, there was a range of codes available for a particular service and that range was based on the complexity of the treatment. Usually, the more complex the treatment, the higher the rate of reimbursement.

39. CPT codes 99334-99337 represented the Evaluation and Management (E/M) codes for domiciliary visits with established patients. CPT code 99337 was the Level 4 or highest complexity code in this category and provided the highest level of reimbursement for such services. For this code to have applied, the visit had to involve at least two of the following: (1) a comprehensive interval history, (2) a comprehensive examination, and

(3) medical decision making of moderate to high complexity. Usually, the presenting medical problem was of moderate to high severity. The patient may have been unstable or had developed a significant new problem requiring immediate attention. Billing CPT code 99337 typically meant that the health care provider spent 60 minutes face-to-face with the patient and/or the patient's family. The other CPT codes for domiciliary or rest-home visits with established patients corresponded with progressively less complex services and typically involved shorter visits.

40. CPT codes 99347-99350 represented the E/M codes for home visits with established patients. CPT code 99350 was the Level 4 or highest complexity code in this category and provided the highest level of reimbursement for such services. For this code to have applied, the visit had to involve at least two of the following: (1) a comprehensive interval history, (2) a comprehensive examination, and (3) medical decision making of moderate to high complexity. Usually, the presenting problem was of moderate to high severity. The patient may have been unstable or had developed a significant new problem requiring immediate attention. Billing CPT code 99350 typically meant that the health care provider spent 60 minutes face-to-face with the patient and/or the patient's family. The other CPT codes for home visits with established patients corresponded with progressively less complex services and typically involved shorter visits.

41. CPT codes 99324-99328 represented the E/M codes for domiciliary visits with new patients. CPT code 99328 was the Level 5 or highest complexity code in this category and provided the highest level of reimbursement for such services. For this code to have applied, the visit had to involve all three of the following: 1) a comprehensive history, 2) a comprehensive examination, and 3) medical decision making of high complexity. The patient may have been unstable or had developed a significant new problem requiring immediate physician attention. Billing this code typically meant that the health care provider spent 75 minutes face-to-face with the patient and/or the patient's family. The other CPT codes for domiciliary or rest-home visits with new patients

1   corresponded with progressively less complex services and typically involved shorter

2   visits.

3   42. CPT codes 99341-99345 represented the E/M codes for home visits with new patients.

4   CPT code 99345 was the Level 5 or highest complexity code in this category and

5   provided the highest level of reimbursement for such services. For this code to apply,

6   the visit had to involve all three of the following: 1) a comprehensive history, 2) a

7   comprehensive examination, and 3) medical decision making of high complexity. The

8   patient may have been unstable or had developed a significant new problem requiring

9   immediate physician attention. Billing this code typically meant that the health care

10   provider spent 75 minutes face-to-face with the patient and/or the patient's family. The

11   other CPT codes for home visits with new patients corresponded with progressively

12   less complex services and typically involved shorter visits.

13   43. CPT code 99354 represented a prolonged service and was a supplemental code billed,

14   in addition to the E/M code, for services that involved direct face-to-face patient contact

15   beyond the usual service. For this code to have applied, the visit must have exceeded

16   the time associated with the E/M code by at least 30 additional minutes, but no more

17   than 74 minutes. For instance, if CPT code 99350 and CPT code 99354 were billed

18   together the total time spent face-to-face with the beneficiary was expected to be

19   between 90 (60+30) minutes and 134 (60+74) minutes. CPT code 99354 was typically

20   used on rare occasions when a beneficiary had extensive health related issues that had

21   been neglected over time.

22   44. Prior to the Covid-19 public health emergency which began on approximately March

23   1, 2020, for home or domiciliary visits, the provider must have been physically present

24   and provided face-to-face services.

25   45. Office Visits. As of January 1, 2021, health care providers could select the level of an

26   office or other outpatient E/M service based on either the level of medical decision

27   making necessary for the services provided or the total time for the E/M services

28   performed on the date of the encounter.

    a. CPT codes 99202-99205 represented the E/M codes for office or outpatient visits with new patients. These codes required a medically appropriate history and/or examination and increasing levels of medical decision making or total time spent. For instance, a Level 1/CPT code 99202, applied when a medically appropriate history and/or examination and straightforward medical decision making occurred or 15-29 minutes of total time was spent on the date of the encounter by the physician or the NPP.

    b. CPT codes 99211-99215 represented the E/M codes for office or outpatient visits with established patients. These codes required a medically appropriate history and/or examination and increasing levels of medical decision making or total time spent. For instance, for a Level 3/CPT code 99213, a medically appropriate history and/or examination and a low level of medical decision making or 20-29 minutes of total time was spent on the date of the encounter by the physician or the NPP. To bill the Level 1/CPT code 99211, which did not require the presence of a physician, the patient must have been established, not new, and "incident to" rules for Medicare patients applied.

46. Telehealth. Beginning on approximately March 1, 2020, as a result of the Covid-19 public health emergency, many health insurance programs began allowing reimbursement for telephone-only evaluation and management services by a physician or other qualified health care professional, such as a nurse practitioner, clinical nurse specialist, certified nurse midwife, or physician assistant, under CPT codes 99441-99443.

    a. CPT code 99441: telephone E/M service; 5-10 minutes of medical discussion.

    b. CPT code 99442: telephone E/M service; 11-20 minutes of medical discussion.

    c. CPT code 99443: telephone E/M service: 21-30 minutes of medical discussion.

47. Covid Vaccines. For immunization administration other than Covid-19, CPT codes 90460 through 90474 represented the allowable codes to bill. CPT codes specific to Covid-19 vaccines were issued and included, as examples 0001A, 0002A, 0011A,

0012A, 0021A, 0022A, 0031A. All Covid-19 immunization administration codes included vaccine counseling, when performed, by the physician or other qualified health care professional. No E/M codes for the administration of the vaccine were allowed. To bill an E/M code when administering the vaccine, there must have been a separately identifiable service performed.

***Records Related to Health Care Services***

48. When a health care provider rendered medical services, the provider typically generated or maintained documentation, sometimes referred to as an "encounter form," that detailed the services rendered by the provider to the patient, provided information about the patient, and identified the rendering provider. To obtain reimbursement, Federal regulations required that any services billed by a provider be supported by documentation maintained by the provider. In Arizona, a health care provider is typically required to retain a patient's medical records for at least six years from the last date of service provided.

49. In a typical medical practice, the health care provider or the practice utilized this documentation to prepare a document to bill the health insurance program for the services rendered. This document was commonly referred to as the "charge slip" or "super bill". The information on a charge slip included, among other information, the beneficiary's identifying information, the rendering provider's identifying information (including the NPI of the provider), the tax identification number of the associated medical practice, the date of service, the diagnosis, a description of the service(s) provided and the corresponding CPT code(s). It was the CPT codes and the type of provider (physician or NPP) that drove the claimed amount of reimbursement.

## **SCHEME AND ARTIFICE TO DEFRAUD**

50. During the time frame alleged in this indictment, the defendant LINH CAO NGUYEN owned, operated, and oversaw his medical practice, running it through multiple corporate names as identified in above-paragraphs.

51. NGUYEN'S practice, as a mobile multi-specialty medical practice, primarily treated patients in homes and living facilities across the greater Phoenix and Tucson metropolitan areas.

52. It was part of the scheme and artifice to defraud that NGUYEN knowingly, willfully, and with the intent to defraud caused to be submitted to the health insurance programs fraudulent claims for payment of medical services. NGUYEN knowingly, willfully, and with the intent to defraud caused to be submitted claims that contained material false statements and the intentional concealment of material facts.

53. Specifically, NGUYEN caused to be submitted to the health insurance programs claims identifying physicians, including himself, as the rendering provider when, in fact, NGUYEN knew that a NPP, such as a nurse practitioner or physician assistant, had provided the service independently and, specific to Medicare, without the required supervision for "incident to" billing. The reimbursement rates were higher for physician-performed services and by billing in this way, NGUYEN falsely inflated and "upcoded" his practice's reimbursement for services actually rendered.

54. Specifically, NGUYEN caused to be submitted to the health insurance programs claims identifying physicians, including himself, as the rendering provider when, in fact, NGUYEN knew that auxiliary personnel, such as wound care nurses, had provided the service independently and, specific to Medicare, without the required supervision for "incident to" billing. Medical services rendered by auxiliary personnel without the required supervision of the physician or NPP under whose NPI the service was billed would not have been reimbursed by Medicare.

55. Specifically, NGUYEN caused to be submitted to the health insurance programs psychotherapy services provided by licensed clinical social workers and other care providers as if those services were rendered by a physician when, in fact, NGUYEN knew that licensed clinical social workers and other care providers, had provided the services independently and, specific to Medicare, without the required supervision for "incident to" billing.

56. Specifically, NGUYEN caused to be submitted to the health insurance programs claims that were not medically necessary because of the frequency with which a patient was seen.

57. Specifically, NGUYEN caused to be submitted to the health insurance programs claims billed at higher complexity levels and including prolonged service codes when NGUYEN knew the level of care did not support those codes.

58. Specifically, NGUYEN caused to be submitted to AHCCCS podiatry-related claims as if those services were performed by a non-podiatrist physician so the services would be covered by AHCCCS when NGUYEN knew those services were provided by other medical professionals, including podiatrists, and were specifically not covered by AHCCCS at the time of the claims. In one conversation with a podiatrist and office staff, NGUYEN told the podiatrist that the podiatrist could "grandfather in" with NGUYEN to bill under NGUYEN, office staff called this billing a "loophole" and NGUYEN confirmed that characterization by stating "I just have to sign your notes".

59. At times, during audits or inquiries from health insurance programs, NGUYEN would falsely create an encounter form and/or a charge slip for a patient visit that occurred many months earlier in an effort to conceal and avoid detection of his practice's fraudulent billing. During one audit, NGUYEN sat in a hallway, falsifying notes for prior claims, sometimes for services that had occurred many months prior to the creation of the note.

60. At times, NGUYEN would instruct his staff to bill services of NPPs, such as nurse practitioners and physician assistants, under the NPIs of physicians, despite knowing that this was fraudulent billing because the services were performed independently by the NPPs and without the required supervision for "incident to" billing. NGUYEN told staff that billing under the physician's NPI was how to get 100% reimbursement rather than the 85% reimbursement. NGUYEN knew his practice was entitled to only 85% for the services provided independently by the NPPs.

61. At times, NGUYEN trained and instructed his health care providers and staff on what CPT codes to use and how to bill the services performed. NGUYEN would misrepresent how services could be billed:

    a. For example, NGUYEN misrepresented to his staff and employees that "incident to" billing allowed billing the services performed by NPPs under the NPIs of physicians, even though NGUYEN knew this was not true as the NPPs performed the services independently and without the required supervision for "incident to" billing.

    b. For example, NGUYEN misrepresented what factors could be included in determining billing for prolonged service codes. At times, NGUYEN told his health care providers to include all the time the providers spent driving to a facility, at a facility to include searching for a patient, talking with facility staff, and dictating notes when billing prolonged CPT code 99354. NGUYEN knew services included in the prolonged service code could only include face-to-face time spent with the patient or the patient's family. NGUYEN would tell his providers to "work smarter, not harder".

    c. For example, NGUYEN misrepresented when the services of auxiliary personnel could be billed under a physician or NPP's NPI. NGUYEN told NPPs, such as nurse practitioners and physician assistants, that they did not need to be present with a nurse when the nurse provided health care services. NGUYEN would tell the NPPs to make a visit within 24 hours of the nurse's service. NGUYEN's practice would then often bill the auxiliary personnel's service under a physician's NPI. NGUYEN knew that the physician or NPP under whose NPI the service was billed had to be present when the auxiliary personnel performed the service and he knew the auxiliary personnel performed the service independently.

    d. For example, when hiring NPPs such as nurse practitioners and physician assistants, NGUYEN provided the NPPs with a spreadsheet of potential salary

calculations. The spreadsheet included only the more complex/more lucrative CPT codes such as CPT codes 99337 and 99350 along with prolonged service codes such as 99354. NGUYEN told NPPs who questioned his billing practices that he just "had to sign the notes" to bill "incident to" services and that he had talked to Medicare which said it was fine to bill in this way. NGUYEN knew this was not true.

62. NGUYEN knew he misrepresented to his health care providers and staff how services could be billed because his practice had been audited and informed on a number of occasions that his billing practices were not allowed. NGUYEN's practice received many claim denials from health care insurance programs citing lack of medical necessity and incorrect providers identified. NGUYEN's practice also received numerous complaints from patients and patients' power of attorneys about services billed that were not performed and the wrong providers identified as the rendering providers. Some of NGUYEN's health care providers and billers also informed him he could not bill in the ways he claimed he could. When one third party biller told NGUYEN that he had to be present with an NPP at a facility, providing direct supervision, if he was billing under his physician NPI, NGUYEN told the biller, "what Medicare doesn't know won't hurt them". NGUYEN called "incident to" billing his "secret sauce". With another provider who questioned him about billing, NGUYEN said his "PIN [NPI] was his identification and by just signing his name he can make money."

63. At times, as part of the concealment of his fraud, NGUYEN employed staff from Vietnam to sign records, such as encounter forms and charge slips, with his signature as if he had reviewed the records and rendered the service or supervised the service when he knew that he had not reviewed the records, rendered the service, or provided supervision. NGUYEN called his staff in Vietnam his "secret weapon".

64. At times, after NGUYEN's NPI was used too much for billing, to spread out the billings to make it appear more legitimate, NGUYEN hired other physicians and billed under

their NPIs, sometimes without their knowledge, for services performed by NPPs or auxiliary personnel independently and without the required supervision for "incident to" billing.

65. At times, NGUYEN's practice did not collect co-pays.

66. On February 8, 2020, NGUYEN's company, MD 24, Inc. TIN xx-xxx4675, was revoked from Medicare for abuse of billing privileges. After the revocation, NGUYEN shifted his practice's Medicare billing to his other companies.

67. At times, NGUYEN, through his companies, fraudulently billed E/M codes, such as office visits and telehealth visits, when the only legitimate services rendered were Covid vaccinations.

**PURPOSE OF THE SCHEME AND ARTIFICE**

68. It was the purpose of the scheme and artifice for NGUYEN to unlawfully enrich himself and others by, among other things, submitting and causing the submission of false and fraudulent claims to the health insurance programs and concealing the submission of false and fraudulent claims to the health insurance programs. In committing this fraudulent scheme and artifice, NGUYEN falsely inflated reimbursements, fraudulently "upcoded", and fraudulently obtained reimbursements for services not performed.

**COUNT ONE**
**HEALTH CARE FRAUD**
**18 U.S.C. § 1347**

69. The factual allegations in paragraphs 1 - 68 are re-alleged and incorporated by reference as though fully stated herein.

70. From a time unknown to the Grand Jury, and continuing from at least as early as June 2011, through at least as late as July, 2021, in the District of Arizona, in and around the greater Tucson and Phoenix areas and elsewhere, the defendant, LINH CAO NGUYEN, through his companies, knowingly and willfully executed and attempted to execute the above-described scheme and artifice to defraud and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and

property owned by and under the custody and control of health care benefit programs as defined in 18 U.S.C. § 24(b), to wit: Medicare, AHCCCS, Tricare, BCBS, and UnitedHealthcare in connection with the delivery of and payment for health care benefits, items, and services in violation of 18 U.S.C. § 1347 and 18 U.S.C. § 2.

## COUNTS TWO THROUGH TWENTY-EIGHT
### FALSE STATEMENTS RELATING TO HEALTH CARE MATTERS
### 18 U.S.C. § 1035

71. The factual allegations in paragraphs 1 - 68 are re-alleged and incorporated by reference as though fully stated herein.

72. On or about the dates set forth below in the District of Arizona, in and around the greater Tucson and Phoenix areas and elsewhere, the defendant, LINH CAO NGUYEN, through his companies, knowingly and willfully made and caused to be made materially false, fictious, and fraudulent statements and representations, in connection with the delivery of and payment for health care benefits, items, and services involving Medicare, a health care benefit program as defined in 18 U.S.C. § 24(b), in violation of 18 U.S.C. § 1035.

73. To wit, NGUYEN knowingly and willfully submitted and caused to be submitted to Medicare materially false, fictious, and fraudulent statements, health records, and claims for health care services as if those services were provided by a physician when, in fact, NGUYEN knew those services were provided by a mid-level provider such as a physician assistant, nurse practitioner, or licensed clinical social worker.

| COUNT | Patient Initials | Date of Service | CPT Codes Submitted to Insurance Program | Amount Billed | Date Claim Submitted to Medicare | Rendering Provider | Fraudulently Billed Provider |
|---|---|---|---|---|---|---|---|
| 2 | M.F. | 12/27/2016 | 99337 | $ 212 | 12/29/2016 | PA Iacono | MD Nguyen |
| 3 | A.M. | 12/29/2016 | 99337 | $ 212 | 12/30/2016 | PA Forsberg | MD Nguyen |

*United States of America v. Linh Cao Nguyen*
*Indictment Page 20 of 24*

| 4 | M.K. | 1/3/2017 | 99337 | $ | 213 | 1/11/2017 | PA Forsberg | MD Nguyen |
|---|---|---|---|---|---|---|---|---|
| 5 | R.G. | 2/9/2017 | 99350 | $ | 196 | 2/14/2017 | LCSW Liu | MD Nguyen |
| 6 | D.B. | 1/24/2017 | 99350 | $ | 196 | 2/21/2017 | NP Rodgers | MD K.K. |
| 7 | L.M. | 3/8/2017 | 99336 | $ | 149 | 3/14/2017 | LCSW Liu | MD Nguyen |
| 8 | K.K. | 3/13/2017 | 99348 | $ | 93 | 3/13/2017 | NP Jacobs | MD Nguyen |
| 9 | J.K. | 3/29/2017 | 99337 | $ | 213 | 4/2/2017 | PA Moody | MD K.K. |
| 10 | L.T. | 2/17/2017 | 99336 | $ | 149 | 4/7/2017 | NP Slack | MD K.K. |
| 11 | G.V. | 4/4/2017 | 99349 | $ | 142 | 4/12/2017 | NP Slack | MD K.K. |
| 12 | M.C. | 4/20/2017 | 99348 | $ | 93 | 4/21/2017 | NP Jacobs | MD Nguyen |
| 13 | E.B. | 5/3/2017 | 99350 | $ | 196 | 5/12/2017 | NP Slack | MD K.K. |
| 14 | J.W. | 6/14/2017 | 99337 | $ | 213 | 6/16/2017 | PA Moody | MD K.K. |
| 15 | C.I. | 7/3/2017 | 99350 | $ | 196 | 7/6/2017 | NP Rodgers | MD K.K. |
| 16 | B.R. | 7/12/2017 | 99350 | $ | 196 | 7/14/2017 | NP Rodgers | MD K.K. |
| 17 | S.C. | 11/27/2017 | 99337 | $ | 213 | 12/22/2017 | PA Moody | MD K.K. |
| 18 | S.C. | 1/18/2018 | 99337 | $ | 213 | 2/13/2018 | PA Moody | MD K.K. |
| 19 | P.G. | 5/7/2018 | 99337 | $ | 213 | 5/11/2018 | LCSW Liu | MD Da.Bu. |
| 20 | S.D. | 7/10/2018 | 99350 | $ | 196 | 7/17/2018 | LCSW Liu | MD Da.Bu. |
| 21 | S.D. | 7/10/2018 | 90833 | $ | 73 | 7/17/2018 | LCSW Liu | MD Da.Bu. |
| 22 | S.D. | 7/10/2018 | 90785 | $ | 15 | 7/17/2018 | LCSW Liu | MD Da.Bu. |
| 23 | M.O. | 1/8/2019 | 99336 | $ | 149 | 1/11/2019 | PA Williams | MD B.H. |
| 24 | B.J. | 2/4/2019 | 99337 | $ | 213 | 2/14/2019 | NP Morgan | MD Da.Bl. |
| 25 | E.B. | 2/6/2019 | 99349 | $ | 142 | 3/3/2019 | PA Williams | MD B.H. |
| 26 | G.W. | 2/11/2019 | 99337 | $ | 213 | 2/14/2019 | NP Morgan | MD Da.Bl. |
| 27 | C.F. | 2/26/2019 | 99337 | $ | 213 | 3/6/2019 | NP Morgan | MD Da.Bl. |
| 28 | G.W. | 4/12/2019 | 99336 | $ | 149 | 4/15/2019 | PA Williams | MD B.H. |

All in violation of 18 U.S.C. § 1035(a)(2) and 18 U.S.C. § 2.

## COUNTS TWENTY-NINE THROUGH FORTY-FOUR
### FALSE STATEMENTS RELATING TO HEALTH CARE MATTERS
### 18 U.S.C. § 1035

74. The factual allegations in paragraphs 1 - 68 are re-alleged and incorporated by reference as though fully stated herein.

75. On or about, or between the dates set forth below in the District of Arizona, in and around the greater Tucson and Phoenix areas and elsewhere, the defendant, LINH CAO NGUYEN, through his companies, knowingly and willfully made and caused to be made materially false, fictious, and fraudulent statements and representations, in connection with the delivery of and payment for health care benefits, items, and services involving Tricare, BCBS, and UnitedHealthcare, health care benefit programs as defined in 18 U.S.C. § 24(b), in violation of 18 U.S.C. § 1035.

76. To wit, NGUYEN knowingly and willfully submitted and caused to be submitted to Medicare materially false, fictious, and fraudulent statements, health records, and claims for health care services not performed.

| COUNT | Patient Initials | Insurance Program | Date of Service | False CPT Code Submitted to Insurance Program | Amount Billed | Date Claim Processed by Insurance Company |
|---|---|---|---|---|---|---|
| 29 | K.J. | BCBS | 3/26/2021 | 99203 | $ 119 | 4/15/2021 |
| 30 | K.J. | BCBS | 4/23/2021 | 99212 | $ 48 | 4/28/2021 |
| 31 | K.J. | BCBS | 7/1/2021 | 98967 | $ 38 | 7/10/2021 |
| 32 | E.J. | BCBS | 3/26/2021 | 99202 | $ 82 | 6/3/2021 |
| 33 | E.J. | BCBS | 4/23/2021 | 99212 | $ 48 | 4/28/2021 |
| 34 | E.J. | BCBS | 7/1/2021 | 98967 | $ 38 | 7/10/2021 |
| 35 | C.L. | United | 3/25/2021 | 99202 | $ 82 | 4/13/2021 |
| 36 | C.L. | United | 4/22/2021 | 99212 | $ 48 | 4/29/2021 |
| 37 | N.H. | United | 3/25/2021 | 99202 | $ 82 | 4/12/2021 |
| 38 | N.H. | United | 4/22/2021 | 99212 | $ 48 | 4/26/2021 |
| 39 | J.R. | United | 3/25/2021 | 99202 | $ 82 | 4/6/2021 |
| 40 | C.R. | United | 4/1/2021 | 99442 | $ 75 | 4/7/2021 |
| 41 | E.S. | Tricare | 3/29/2021 | 99202 | $ 82 | 7/9/2021 |
| 42 | E.S. | Tricare | 4/26/2021 | 99212 | $ 48 | 7/30/2021 |
| 43 | J.S. | Tricare | 4/5/2021 | 99202 | $ 82 | 7/30/2021 |
| 44 | M.R. | Tricare | 4/6/2021 | 99203 | $ 119 | 7/30/2021 |

All in violation of 18 U.S.C. § 1035(a)(2) and 18 U.S.C. § 2.

//

## COUNTS FORTY-FIVE THROUGH FIFTY
## AGGRAVATED IDENTITY THEFT
### 18 U.S.C. § 1028A

77. The factual allegations in paragraphs 1–68 are re-alleged and incorporated by reference as though fully stated herein.

78. On or about the dates set forth below in the District of Arizona, in and around the greater Tucson and Phoenix areas and elsewhere, the defendant, LINH CAO NGUYEN, through his companies, did knowingly use, without lawful authority, a means of identification of another person during and in relation to a felony violation enumerated in 18 U.S.C. § 1028A(c), to wit, health care fraud in violation of 18 U.S.C. § 1347 as charged in Count One of this indictment, knowing that the means of identification belonged to another actual person, to wit: MD K.K., as set forth in each count below:

| Count | Date of Service | Date Claim Submitted to Medicare (CMS) | Patient Initials | Rendering Provider | Provider Under Which Nguyen Falsely Billed | CPT Code Billed |
|---|---|---|---|---|---|---|
| 45 | 1/24/2017 | 2/21/2017 | D.B. | NP Rodgers | MD K.K. | 99350 |
| 46 | 3/29/2017 | 4/2/2017 | J.K. | PA Moody | MD K.K. | 99337 |
| 47 | 4/4/2017 | 4/12/2017 | G.V. | NP Slack | MD K.K. | 99349 |
| 48 | 6/14/2017 | 6/16/2017 | J.W. | PA Moody | MD K.K. | 99337 |
| 49 | 7/12/2017 | 7/14/2017 | B.R. | NP Rodgers | MD K.K. | 99350 |
| 50 | 1/18/2018 | 2/13/2018 | S.C. | PA Moody | MD K.K. | 99337 |

All in violation of 18 U.S.C. § 1028A(a)(1) and 18 U.S.C. § 2.

## FORFEITURE ALLEGATION

79. The factual allegations in paragraphs 1–68 are re-alleged and incorporated by reference as though fully stated herein. The allegations contained in Counts 1-44 of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to 18 U.S.C. § 982(a)(7).

80. Upon conviction of the offenses in violation of 18 U.S.C. § 1347 and 18 U.S.C. § 1035 set forth in Counts 1-44 of this Indictment, the defendant, LINH CAO NGUYEN, shall forfeit to the United States of America, pursuant to 18 U.S.C. § 982(a)(7), any property,

real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offenses.

    a. If any of the property described above, as a result of any act or omission of the defendant:

        i. cannot be located upon the exercise of due diligence;

        ii. has been transferred or sold to, or deposited with, a third party;

        iii. has been placed beyond the jurisdiction of the court;

        iv. has been substantially diminished in value; or

        v. has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p) to seek forfeiture of any other property of said defendant up to the value of the above forfeitable property, including but not limited to all property, both real and personal, owned by the defendant.

    All pursuant to 18 U.S.C. § 982(a)(7); and Rule 32.2(a), Federal Rules of Criminal Procedure.

A TRUE BILL

**/ s /**

_____
Presiding Juror

GLENN B. McCORMICK
Acting United States Attorney
District of Arizona

**REDACTED FOR
PUBLIC DISCLOSURE**

**/ s /**
_____
Assistant U.S. Attorney
Dated: October 20, 2021